IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2018 Session

## STATE OF TENNESSEE v. ALEXANDER R. VANCE AND DAMONTA M. MENEESE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-C-2274     J. Randall Wyatt, Jr., Judge**

———————————————————

### No. M2017-01037-CCA-R3-CD

———————————————————

The Defendants, Alexander R. Vance and Damonta M. Meneese, were each convicted of second degree murder, first-degree murder in perpetration of a felony, especially aggravated robbery, and three counts of aggravated assault.  As to each, the trial court merged the second degree murder conviction into that for first-degree murder, imposing an effective sentence of life imprisonment plus 21 years.  In these consolidated appeals, both defendants argue that the trial court erred in allowing hearsay testimony by a State witness regarding a statement made by a co-defendant whose charges had been severed from the two defendants in this matter.  Additionally, the Defendant Vance argues that the evidence is insufficient to sustain his convictions, and the Defendant Meneese argues that the trial court erred by ordering partial consecutive sentencing.  Following our review, we affirm the judgments of the trial court as to both defendants.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Alexander R. Vance, and Jamaal L. Boykin for the appellant, Damonta M. Meneese.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

Needing money to purchase steel-toed boots for a job he was starting, the victim, Stephen Milliken, decided to sell some recording equipment which he owned. The street gang-affiliated Defendants arranged to meet with him, under the guise of purchasing the equipment. Instead, the Defendants robbed the victim, firing handguns at him and his friends as the victim tried to escape in his vehicle. The Defendants fired 7 to 8 shots at the fleeing vehicle, one of which fatally struck the victim in the neck. The slug went through two of his vertebrae and came to rest in his spine. He died after being taken to Vanderbilt Hospital. We will set out the proof presented at trial.

As the victim arrived at the Trinity Hills apartments in Nashville on the evening of December 26, 2012, he was accompanied by his girlfriend, Jalisa Harris, who was driving, along with the victim's brother, Christopher Holt, and a friend, Prince Myles.

The Defendant Vance's cousin, James Gray, the State's first witness, said that the State was forcing him to testify at the trial. Mr. Gray said that, while he was once heatedly arguing with the Defendant Vance, the Defendant Vance said that he already "got one n****r under [his] belt" and that Mr. Gray, himself, could end up "like a n****r at T Hill."[1]

Lodorea Page testified that James Gray was the father of her child and that the Defendant, Damonta Meneese, was her brother. Alexander Vance, the other Defendant, was the father of her sister's baby. She said she had heard the Defendant Vance say that he had studio recording equipment he wanted to sell to buy Christmas presents for his child. She said that she did not see the Defendant Vance in the courtroom, although he was present, and she and did not want to testify because she didn't "want to put me or my kids [sic] life on the line, neither my baby daddy, because it is like a Crip gang that they are in and our car already got shot up[.]"

Christopher Holt said that the victim was his younger brother and was 18 when he was killed. Mr. Holt went with the victim on December 26, 2012, to sell recording equipment at the Trinity Hills Apartments, apparently, to Joshua Meneese,[2] who was known as "Neno." The victim's girlfriend, Jalisa Harris, drove their car, and another friend, Prince Myles, accompanied them. No one met them at the apartment complex as they had expected; so, they left. Soon afterwards, they received a telephone call from

---

[1] As we have set out, the victim was killed at the Trinity Hills apartments.

[2] Since brothers Joshua Meneese and Damonta Meneese share the same surname, we will refer to Joshua Meneese by his nickname, "Neno," to avoid continuously repeating the full names of both. We intend no disrespect by this.

Neno, asking them to return. As they arrived at the apartment complex the second time, three men were standing in the driveway, two of whom were Neno and his brother, the Defendant, Damonta Meneese. The victim and Mr. Myles got out of the car, and Ms. Harris opened the trunk, where the equipment was located; and it was taken out. Mr. Holt was not familiar with the third person who was present. Mr. Holt and Ms. Harris waited in their vehicle and, after five or six minutes, the victim got into the car and said "these n****rs just robbed [him][.]" Mr. Holt then saw someone backing Mr. Myles up to the car, as he was asking why "y'all going to do us like that?" A voice told Mr. Myles to "get [his] ass on the car;" and he got in and told Ms. Harris to drive away. As they were leaving, seven or eight shots were fired "instantly" into the car's back window by the two persons standing behind them. As he left, Mr. Holt saw Neno standing in a stairwell of the apartments. Just before the shots were filed, Neno yelled, "'shoot them n****rs,' some shit like that[.]" Mr. Holt saw that the victim was slumped over and was bleeding from the head. From Skyline Hospital, where they took him for treatment, the victim was transported to Vanderbilt Hospital, where he was pronounced dead.

Mr. Holt testified that he identified the Meneese brothers in a photographic lineup. He said that he could not identify the Defendant Vance, but that Mr. Myles had said he was the third person. He said that, of the three men, Neno was the only one not wearing a hoodie. He believed he heard one of the three say the name "Alex."

Jalisa Harris testified that she had been dating the victim for around a month and a half before he was killed. She lived with Mr. Myles who, in turn, was friends with Neno, who often visited them. She said that she was driving when they arrived at the Trinity Hills Apartments. They were met by Neno, who spoke with her, a person called "Monte," whom she believed to be his brother, and another man she did not know. After they told her that the intended buyers did not yet have all the purchase price, she and her passengers left the apartments. When they later returned, they were met by the same three men, who went around to the back of the car. The victim and Mr. Myles got out of the car. After about two minutes, she could see in her mirror that the victim was on the ground and Mr. Myles was backed up against the car. The person whom she did not recognize had a pistol pointed at Mr. Myles, and she saw that Neno also had a pistol. The victim got back in the car and said he had been robbed. Soon, Mr. Myles also got back into the car, and she learned that the three men had taken the recording equipment and the victim's cell phone. She began driving away, heard gunshots, and knew that bullets were striking her car. As they soon were checking each other for injuries, they saw that the victim was not responding and took him to Skyline Hospital for treatment.

Ms. Harris said that when she first talked with police officers, she knew only the nicknames of the assailants. She believed that the one called "Monte" was the brother of Neno, whom she identified from a series of photographs as the Defendant Meneese. She

said that she wrote on the photograph of him that she identified that he was waving a gun and telling the others to shoot at the car.

The Metropolitan Nashville Police Department received a "shots fired" call at 6:37 p.m., to which a number of officers responded. At the scene, officers located eight 9mm shell casings, five of which later were determined to have been fired from the same weapon. However, no weapons were located.

Two medical experts testified for the State. Dr. Timothy Nunez, who had treated the victim at Vanderbilt Hospital, said that the victim sustained a gunshot wound to his posterior neck, and the slug went through his spinal cord. The victim had to use a ventilator to breathe and, due to swelling in his brain, could not survive. He was pronounced dead the following morning. Dr. Thomas Deering, the medical examiner, performed the autopsy on the victim and said the cause of death was a gunshot wound to the neck. The slug traveled from back to front and slightly left to right. It was embedded in the C2 vertebra.

Mr. Prince Myles, a passenger in the same vehicle as the victim, was called by the state as a witness but would say nothing other than that he knew the victim. During the jury-out hearing that followed, Mr. Myles said that he was unable to remember what had happened the evening the victim was killed or what he had told police officers about it on any of the occasions he had spoken with them. He acknowledged that he was acquainted with the Defendants, but did not recall telling police officers that they were involved in the robbery or murder of the victim.

With the jury again in the courtroom, Mr. Myles testified that, while he remembered the day of December 26, 2012, he did not remember what happened that day. He did remember police officers talking to him but could not recall what they had talked about.

Detective Stanley Truitt testified that he was employed by the Nashville Metropolitan Police Department, and on the night of the shooting, he recorded his interview of Prince Myles. The recording was then played for the jury. Detective Truitt said that he again interviewed Mr. Myles on January 4, 2013, and the recording of that interview also was played for the jury. Shown a photographic lineup during that interview, Mr. Myles identified the Defendant Meneese in one photographic lineup and his brother, Neno, in another.

Detective Andrew Davis, of the Metropolitan Nashville Police Department, told the jury that he had interviewed Mr. Myles on May 3, 2014, and the recording of this interview also was played for the jury. During this interview, Mr. Myles circled the

photograph of the Defendant Vance, which, Detective Davis testified, showed that the Defendant had a tattoo of a small cross on his right cheek.

Detective Davis said that he had spoken with the three witnesses who had been in the car with the victim, and all were scared and "reluctantly cooperative." In describing their assailants, the witnesses gave the names "Alex," and "Neno," and "Monte." From these names, another detective said that two of the shooters might have been the Meneese brothers. Detective Davis said that Mr. Holt identified the Meneese brothers from a photo lineup, while Mr. Harris identified "Neno." Detective Davis found a Facebook account under the name "Monte," which was the account of Damonta Meneese. Through subpoenas, Detective Davis obtained phone records for a Brian Thompson and the Defendant Vance. Detective Davis said that both the victim and Mr. Myles had made telephone calls to the Defendant Vance's telephone, the latter call being made just after the victim had been shot and was being driven to the hospital. Mr. Myles identified Alexander Vance, and James Gray later told Detective Davis that the Defendant Vance's nickname was "ABK 60," and that "60" was a way of referring to the Nashville street gang, the Rollin Crip 60, while the initials "ABK" was shorthand for "Any body [sic] killer." Both defendants rested without presenting any proof.

## ANALYSIS

We will review the issues raised on appeal by the defendants.

### I. Statement of Severed Co-defendant Joshua "Neno" Meneese

Both defendants argue on appeal that the trial court erred by allowing Detective Davis to deny that there was no proof, besides the witness Prince Myles, to implicate either of them in the offense. Following a jury-out hearing, the trial court allowed Detective Davis to testify that Mr. Myles was not the only witness to implicate the Defendants. The State responds that the trial court correctly applied the doctrine of curative admissibility after the Defendants had opened the door for introduction of the hearsay statement.

In our review of this issue, we will set it out the way it developed at trial.

Prior to the trial of these two defendants, Neno's matter had been severed because of questions regarding his competency to stand trial. Following his arrest, Neno had given a statement to police officers that implicated himself, and the Defendants Vance and Meneese, as committing the robbery and murder of the victim. Subsequently, counsel for the Defendant Vance had filed a motion in limine as to this statement, which the court had granted. The State advised that Neno would not be called as a witness

- 5 -

against his two co-defendants and that his statement would not be utilized during the trial. During the presentation of the State's case, and after both defense counsel had cross-examined Detective Davis, the State asked the trial court to be allowed to question him regarding the statement given by Neno. According to the State's argument, the defense questioning of Detective Davis had "opened the door," under the doctrine of curative admissibility, for the State then to question him regarding Neno's statement to him.

The trial court asked the State what specific question would be asked of Detective Davis, and the State responded, "Other than Prince Myles[,] were you able to interview another person with personal knowledge who was at the scene who also implicated these two defendants?" Both defense counsel objected to the State's being allowed to ask this question, but the court overruled their objections. Questioned by defense attorneys as to whether they then could question Detective Davis regarding the mental state of Neno, the court replied that, while defense counsel would be allowed to do so, "[T]hat is going to open to open the door to a whole lot of other things coming in here that [you] wouldn't want to come in here."

After the jury had returned to the courtroom, the State then commenced with its redirect examination of Detective Davis:

Q: OK. Then finally the most important question I will ask you, other than Prince Myles[,] was there a witness with independent and personal knowledge who was at the scene who implicated Damonta Meneese in this case?
A: Yes.
Q: Was there, other than Prince Myles, was there a witness with independent and personal knowledge who was at the scene and implicated Alexander Vance in this case.
A: Yes, there was.

Both defendants raised this issue in their motions for new trial. However, in its lengthy and detailed separate orders on each of the motions, the court concluded that its ruling during the trial was correct. In the order denying the motions of the Defendants for new trial, the court found that, in their questioning of Detective Davis, "their lines of questioning created a strong negative inference that the only eyewitness who had independently identified [the Defendants] as the perpetrators was Mr. Prince Myles." Thus, the court continued that, "to not have allowed the State to rebut the negative inference created by cross-examination would have eviscerated the 'fundamental guarantee of fairness' that exists in such proceedings."

As to the Defendants' arguments that the two questions permitted to be asked to Detective Davis violated the Confrontation Clause, the court disagreed. Determining that "the implication of a defendant's Confrontation Clause rights does not prohibit the application of the doctrine of curative admissibility[,]" the court explained that to "rule otherwise would allow defendants to hide behind the Confrontation Clause to introduce otherwise inadmissible evidence or to create inferences that are favorable to the defense, knowing that even if the doctrine of curative admissibility otherwise applied, the State could not introduce certain evidence in rebuttal."

On appeal, the Defendants again argue that the trial court erred in this ruling, asserting that the State's utilizing Neno's statement as it did violated their rights to confront their accuser and to cross-examine a witness against them. The State responds that the trial court ruled correctly in applying the doctrine of curative admissibility and finding that the Defendants had opened the door to this evidence by questions asked of Detective Davis during his cross-examination.

On appeal, both defendants, as well as the State, discuss State v. Land, 34 S.W.3d 516 (Tenn. Crim. App. 2000), a widely-cited opinion authored by former Court of Criminal Appeals Judge David Hayes. As to the applicability of Judge Hayes' opinion to this appeal, the parties reach opposite conclusions; the Defendants distinguish the facts of that case from those of the present matter, while the State argues that it is directly on point. As we will explain, we agree with the State.

In that case, the defendant, Samuel D. Land, was fleeing from police officers, driving his mother's vehicle at a high rate of speed on Interstate 65, south of Nashville. He turned off of the interstate near the Cool Springs Galleria, nearly losing the pursuing officers. When they located his vehicle, it was wrecked in a ditch with the door open, and Mr. Land had fled the scene on foot. Officers checked the ownership of the vehicle and found that it was registered to Mr. Land's mother, who lived a short distance away. Officers drove to her residence, where they told her that her car had been wrecked, and she named her son as the thief:

> Trooper Cash informed Mrs. Land that "her vehicle had been wrecked a short distance from her home." Mrs. Land, the appellant's mother, became angry and "started cursing." She exclaimed, "He, [the appellant], stole my car, he stole my car." Trooper Cash accompanied Mrs. Land to the appellant's bedroom; the appellant was not there. Mrs. Land told Trooper Cash, "He's drunk, he stole my car." She also informed Trooper Cash that her car keys were in her purse and that the appellant took the keys out of her purse and stole her vehicle. She advised that she wanted to file criminal charges.

Id. at 522.

The statement of Mrs. Land became relevant because of a later conversation between Detective Brown and the defendant:

> Detective Brown encountered the appellant in the hallway of the General Sessions Court as the appellant was being escorted to meet with his appointed counsel. The appellant informed Detective Brown that "[t]he charge of theft is not correct, it should have been unauthorized use of a vehicle since it was [my] parents' vehicle."

Id.

The defendant filed an unsuccessful motion to quash this statement, arguing that it was an illegal custodial statement which implicated him as being the driver of the fleeing vehicle:

However, applying the doctrine of curative admissibility, this court disagreed:

> [W]e conclude that the statements were properly admitted during redirect examination under the doctrine of curative admissibility. Most often employed in criminal cases where the "door" to a particular subject is opened by defense counsel on cross-examination, the doctrine of curative admissibility permits the State, on redirect, to question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination. This doctrine provides that "[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." In other words, "[i]f A opens up an issue and B will be prejudiced unless B can introduce contradictory or explanatory evidence, then B will be permitted to introduce such evidence, even though it might otherwise be improper."

Id. at 530-31 (citations omitted).

The Defendants respond that Land was decided before the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004) (holding that testimonial evidence violates the right to confrontation). However, our supreme court already has rejected that argument, as explained in State v. Robinson, 146 S.W.3d 469, 493 (Tenn. 2004), a case where defense counsel, himself, had questioned an investigating officer

asking about other persons, not testifying at the trial, who had picked the defendant from a photo lineup:

> While the defendant may very well be correct that both Crawford and Tennessee Rule of Evidence Rule 803(1.1) bar hearsay statements of identification if the declarant does not testify at trial, neither Crawford nor Rule 803(1.1) is dispositive in this case because the defendant himself both elicited and opened the door to the testimony he now assigns as error. Under these circumstances, the defendant is not entitled to relief. Indeed, it is well-settled that a litigant "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct."

Id. (quoting Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1952)).

In the later case of State v. Jack Price and Larry Thomas Cochran, No. E2011-01050-CCA-R3CD, 2013 WL 5371679, at *14 (Tenn. Crim. App. Sept. 26, 2013), perm. app. denied (Tenn. Mar. 11, 2014), this court cited a number of examples in which a defendant on trial opened the door to use of a statement of a co-defendant who was not being tried, which implicated the defendant on trial in the criminal act:

> Several circuit courts have directly concluded that a defendant can open the door to admission of Bruton evidence otherwise barred by the Confrontation Clause. See United States v. Jimenez, 509 F.3d 682, 691 (5th Cir. 2007) (defense counsel opened the door to codefendant's statements implicating the defendant by repeatedly asking the Drug Enforcement Administration agent to explain the basis for his suspicions about the defendant); United States v. Jernigan, 341 F.3d 1273, 1290 (11th Cir.2003) (defendant invited Bruton error by stipulating to the admission of tape containing co-defendant's implicating statements); United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir.1992) ("[A] defendant who elicits a statement that may be violative of Bruton may not later claim error based on the admission of that statement."); United States v. Ramos, 861 F.2d 461, 468 (6th Cir.1988) (defense counsel's insistence on pursuing line of questioning opened door to Bruton error; testimony about statements from a non-testifying conspirator was only allowed after defense counsel had implicated conspirator's confession and was an attempt to clarify any misconception created by defense counsel's cross-examination).

In Land, 34 S.W.3d at 532, this court explained that an abuse of discretion standard is used regarding evidence admitted by the trial court in its application of curative admissibility. See generally State v. Chearis, 995 S.W.2d 641 (Tenn. Crim. App. 1999). Applying this standard, we conclude that the trial court did not abuse its discretion in ruling that the Defendants had opened the door to the use of Neno's statement to prevent the impression only a single witness identified the two Defendants as participants in the crime.

## II. Sufficiency of the Evidence

The Defendant Vance argues on appeal that the evidence presented at trial was insufficient to support his convictions. We disagree, for reasons which we will explain.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court explained the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

We will review the State's proof against the Defendant Vance. Detective Davis testified that after Mr. Myles had viewed a photo lineup, which included a photograph of the Defendant Vance, Mr. Myles identified him as one of the participants in the homicide and robbery of the victim. Detective Truitt testified that he had shown Mr. Myles two separate photo lineups, and in the first, he picked the Defendant Meneese and in the second, Neno, as being participants in the robbery and homicide. Additionally, Detective Truitt testified that Mr. Holt, shown two separate photo lineups, selected Neno from one and the Defendant Meneese from the other. Mr. Holt also said that he heard the name "Alex" spoken at the scene. Jalisa Harris also said that she heard the name "Alex" spoken at the scene. On appeal, the Defendant Vance argues Mr. Myles was not a believable witness. However, as we have set out, the identifications made by Mr. Myles were not the only evidence against the Defendant Vance. Further, by their verdict, the jury concluded that Mr. Myles was a credible witness as to these identifications, and we cannot disturb that determination. Accordingly, this issue is without merit.

### III. Sentencing of the Defendant Meneese

On appeal, the Defendant Meneese argues that the trial court erred in ordering that his three sentences for aggravated assault be served consecutively to each other as well as to his life sentence for the homicide conviction.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. We, similarly, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in Bise, 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In sentencing the Defendant Meneese, the trial court found, as set out in its written sentencing order, that he was "a dangerous offender" and his actions, along with the actions of the Defendant Vance, "greatly endangered the lives of three individuals other than [the victim]"; that "an extended sentence beyond a life sentence [was] necessary to protect the public from any possibility of further criminal conduct by the Defendant"; and that an extended sentence was "reasonably relate[d] to the severity of the offenses."

The conclusion of the trial court is easily supported by the evidence at trial. The proof established that, after taking the property of the victim, the Defendants shot 7 or 8 times at the victim's fleeing vehicle. When the shots were fired, the victim posed no threat to the Defendants. One of the slugs fired into the car struck the victim in the back of his head, killing him. From all of this, we conclude that the trial court did not abuse its discretion in finding that the Defendant Meneese was a dangerous offender, that an extended sentence was necessary to protect the public from future criminal conduct by the Defendant Meneese, and that an extended sentence was reasonably related to the severity of the offenses.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE